[Cite as *Tauchert v. Rumpke Sanitary Landfill, Inc.*, 2024-Ohio-4551.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| AMBER TAUCHERT, Personal Represenative and Adminstrator of the Estate of Carl Minton Tauchert, Jr., | : | APPEAL NO. C-230566 TRIAL NO. A-2202471 |
| | : | |
| Plaintiff-Appellant, | : | *O P I N I O N.* |
| vs. | : | |
| RUMPKE SANITARY LANDFILL, INC., | : | |
| Defendant-Appellee. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  September 18, 2024


*O'Connor, Acciani, & Levy* and *Robert B. Acciani*, for Plaintiff-Appellant,

*Michael T. Cappel, Keating, Muething & Klekamp PLL, Sarah V. Geiger, Reminger Co., LPA,* and *Michael J. Caligaris*, for Defendant-Appellee.

**ZAYAS, Presiding Judge.**

{¶1} Plaintiff-appellant Amber Tauchert, in her capacity as personal representative and administrator of the estate of Carl Tauchert, Jr., ("Tauchert") appeals the judgment of the Hamilton County Court of Common Pleas granting summary judgment in favor of defendant-appellee Rumpke Sanitary Landfill, Inc., ("Rumpke") on her survivorship and wrongful-death claims. For the reasons that follow, we sustain the sole assignment of error, reverse the judgment of the trial court, and remand the cause for further proceedings consistent with this opinion and the law.

## I. Facts and Procedural History

{¶2} On the evening of October 28, 2018, Carl Tauchert, Jr., was driving his vehicle on Buell Road in Colerain Township, Hamilton County, Ohio. When he reached the area of 3200 Buell Road, a tree located on Rumpke's adjacent land fell on top of his vehicle, crushing the vehicle and resulting in severe injury that ultimately led to his death several months later.

{¶3} Tauchert, Carl's daughter, filed this survivorship and wrongful-death action against Rumpke, asserting that Rumpke's negligence in maintaining and inspecting its property in the area of 3200 Buell Road was the cause of the accident and resulting injury that led to Carl's death.

{¶4} After discovery, Rumpke moved for summary judgment on Tauchert's claims, arguing that, because 3200 Buell Road was rural and Rumpke had no actual or constructive knowledge of any patently defective condition of any tree in the area, Tauchert could not show that Rumpke breached any duty of care as Rumpke had no duty to inspect its trees along the roadway to discover any defects. Further, Rumpke argued that, even if 3200 Buell Road was urban, Tauchert still could not show that it breached any duty of care as, based on the evidence in the record, the stump identified

2

by Tauchert's expert could be conclusively excluded as the subject stump and the only evidence of the condition of the tree at the time of the accident showed that the tree was bark covered and contained no apparent signs of decay.

{¶5} Tauchert responded in opposition to summary judgment, arguing that issues of material fact remained as to whether 3200 Buell Road was rural where the evidence showed that the land was not expressly classified as rural by Hamilton County or Colerain Township, and as to whether Rumpke lacked constructive notice of the defective condition of the subject tree where the record contained evidence that Rumpke should have observed that the tree was dead and in a hazardous condition prior to the accident.

{¶6} The trial court ultimately agreed with Rumpke and granted summary judgment in favor of Rumpke, finding that the evidence and the law "demands that the Court find the accident area to be a rural area," and no evidence indicates that Rumpke had actual or constructive knowledge of any patently defective condition of the subject tree prior to the accident.

{¶7} Tauchert now appeals from the trial court's judgment, arguing in a single assignment of error that the trial court erred in granting summary judgment in favor of Rumpke where the evidence in the record does not show as a matter of law that the area was rural, and the trial court improperly weighed the competing expert opinions when reaching its conclusion that Rumpke lacked constructive notice.

## II. Law and Analysis

### A. Standard of Review

{¶8} "To obtain summary judgment, the moving party must show that (1) there are no genuine issues of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable

minds can come to but one conclusion when reviewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party." *Midland Credit Mgmt., Inc. v. Naber*, 2024-Ohio-1028, ¶ 6 (1st Dist.), citing *Grafton v. Ohio Edison Co.*, 1996-Ohio-336. "The moving party has the initial burden of informing the trial court of the basis for the party's motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim." *Id.*, citing *Dresher v. Burt*, 1996-Ohio-107. "If the moving party meets this initial burden, the nonmoving party then bears the burden of setting forth 'specific facts showing that there is a genuine issue for trial.'" *Id.*, citing Civ.R. 56(E). "If the nonmoving party does not do so, then summary judgment is appropriate and must be entered against the nonmoving party." *Id.*

{¶9} "This court reviews a trial court's grant of summary judgment de novo." *Id.*, citing *Mid-Century Ins. Co. v. Stites*, 2021-Ohio-3839, ¶ 10 (1st Dist.).

### B. Summary Judgment was Improperly Granted in Rumpke's Favor

{¶10} When determining the duty of a landowner in relation to trees abutting a public highway, a distinction has arisen in the law between urban and rural landowners. *See Heckert v. Patrick,* 15 Ohio St.3d 402, 403-406 (1984).

{¶11} Under this distinction, a rural landowner does not have a duty "to inspect trees growing adjacent to the roadway or to ascertain defects which may result in injury to a traveler on the highway." *Heckert* at paragraph one of the syllabus. This lack of duty arises from the general principle that landowners are not liable to others outside of the land for physical harm caused by a natural condition of the land. *Id.* at 404. An exception exists, however, if a rural landowner "has actual or constructive knowledge of a patently defective condition of a tree which may result in injury to a traveler." *Id.* at paragraph one of the syllabus and 405. In such a situation, the rural

4

landowner "must exercise reasonable care to prevent harm to a person lawfully using the highway from the falling of such tree or its branches." *Id.*

{¶12} On the other hand, an urban landowner has "a duty of reasonable care relative to the tree, including inspection to make sure that it is safe." *See id.* at 405. This is because, unlike a rural landowner, an urban landowner "is subject to liability to persons using a public highway for physical harm arising from the condition of trees near the highway." (Emphasis sic.) *See id.* at 404, citing 2 Restatement of the Law 2d, Torts, § 363(2), at 258 (1965). The duty of an urban landowner "requires no more than reasonable care on the part of the [landowner] to prevent an unreasonable risk of harm to those in the highway, arising from the condition of the trees." 2 Restatement, § 363(2), Comment e. This duty of reasonable care "may" require the urban landowner "to inspect all trees which may be in such dangerous condition as to endanger travelers." *Id.* "It will at least require [the landowner] to take reasonable steps to prevent harm when [the landowner] is in fact aware of the dangerous condition of the tree." *Id.*

{¶13} The rationale for this distinction between rural and urban landowners relates to the disproportionate burden that was thought to be placed on rural landowners to inspect and improve land that, in the early days, largely remained in a primitive state. *Heckert*, 15 Ohio St.3d at 405, fn. 2; *see also generally Estate of Durham v. City of Amherst*, 51 Ohio App.3d 106, 109 (9th Dist. 1988), quoting *Woods v. Blodgett*, 1986 Ohio App. LEXIS 6800 (6th Dist. May 16, 1986) ("'[T]he distinction made between rural and urban landowners and the greater duty placed on urban landowners [to inspect their property] reflects a recognition of the fact that it is not excessively burdensome to impose the duty of reasonable care to prevent injury from trees on urban landowners who typically hold small parcels of land.'"). Thus, a lesser

standard of care was developed "with reference to rural, farm, timber, or little used land as opposed to strictly urban property." *Heckert* at 404-405.

**{¶14}** However, when adopting the distinction between urban and rural landowners, the Ohio Supreme Court recognized that "the distinction becomes a more difficult application with the rapid development of our suburban areas, and the increased amount of vehicular traffic in what might be considered the gray areas lying somewhere between the city and the more remote farm or rural area." *Id.* at 405. Accordingly, the court set forth factors that should be considered by the trier of fact in determining the law that is to be applied to an abutting landowner: the location of the highway, its size and type, as well as the number of people utilizing it. *Id.* at 406.

**{¶15}** Thus, in suburban areas, the determination of a landowner's duty in relation to trees abutting a public highway is an issue of fact to be determined based on the characteristics of the highway in question and whether these attributes warrant treating the highway as an urban or a rural highway. *See id.*

**{¶16}** Tauchert first argues that the trial court erred in determining, as a matter of law, that 3200 Buell Road was rural in nature where competing evidence was offered in the record as to whether the area was urban or rural.

**{¶17}** In moving for summary judgment, Rumpke argued that the "undisputed facts" demonstrate that the accident occurred in a rural area. In support of its assertion, it pointed to aerial and street view photographs in the record that purportedly revealed the "rural nature" of the road, and the zoning classification set forth by Colerain Township, R-2, which is limited to "development consistent with the rural character of Colerain Township."

**{¶18}** In responding in opposition to summary judgment, Tauchert pointed to the fact that the Hamilton County Auditor has assigned a land use code of 500 to the

parcel, which is the classification for "Residential Vacant Land." Tauchert then pointed to the other potential land-use categories, such as forestland, for Hamilton County that were more akin to rural uses and suggested that the failure to assign the land a rural-natured use code was evidence that the land was urban in nature, and not rural. She similarly pointed out that Colerain Township zoned the land R-2, the classification for "Estate Residential District," rather than R-1, the classification for "Rural Residential District."

{¶19} In reply, Rumpke pointed to depositional testimony in the record of various witnesses that cumulatively described the area as scenic and wooded with lots of wildlife, and no sidewalks or mailboxes and not a lot of houses. Most particularly, Rumpke's expert described the area as steep, densely wooded hillsides, surrounded by 320 forested acres and approximately 48,000 trees.

{¶20} The trial court relied on the evidence put forth by Rumpke and found, as a matter of law, that the area was rural in nature. In doing so, the trial court explicitly gave "little significance" to the Hamilton County Auditor's designated land-use code. Tauchert argues that this was error as the failure of Hamilton County and Colerain Township to use expressly rural classifications for Rumpke's land creates a genuine issue of material fact as to whether Buell Road is rural or urban in nature.

{¶21} However, rather than reach this issue, we hold that we need not decide whether the property is rural or urban on summary judgment as genuine issues of material fact remain under either standard. Consequently, we leave the urban versus rural determination for the trier of fact to decide.

{¶22} First, even if 3200 Buell Road is rural in nature, genuine issues of material fact remain as to whether Rumpke had constructive notice of the asserted patently defective condition of the subject tree.

{¶23} "A person has constructive notice of a hazard 'if it was of a nature that it could or should have been discovered, if it existed long enough to have been discovered, and its discovery would have created a reasonable apprehension of danger.'" *Thorton v. Borstein*, 2021-Ohio-2231, ¶ 16 (9th Dist.), citing *Davis v. Akron*, 2014-Ohio-2511, ¶ 16 (9th Dist.).

{¶24} Rumpke moved for summary judgment, arguing that no genuine issue of material fact remained for trial where there was no evidence to show that it knew or should have known of the defective condition of the subject tree. In support of its assertion, Rumpke pointed to evidence to show that its employees who did "drive-by inspections" of the roads surrounding the landfill failed to identify the tree as hazardous and pointed to photographs of the fallen tree taken the night of the accident to show that the bark was still intact on the tree and there were no apparent signs of fungus or decay.

{¶25} Larry Riddle, who was Rumpke's landfill manager at the time of the accident, testified in his deposition that, as part of his responsibilities, he would "drive around the perimeter of the landfill downwind" to check for nuisances from the landfill. He said, over the years, he would "observe things like trees that were on or close to the roadway that [he] would report that [they] could have somebody come out and look at." He said this was "not something that happens every day," but there were "several occasions" where they took trees down. He testified, "Over the years we've had a lot of Ash trees that have failed with the Emerald Ash Borer. So there's been a lot of trees taken down basically out of just—it was the right thing to do." He said he would notice if a tree was leaning or diseased, didn't have any leaves in the summertime, or the bark was sloughing. If he found a tree that "didn't look right," he would contact the facilities manager, Dave Ferrier, and let him know. However, he

denied "driving down the road and looking at trees as [he] goes," or "specifically looking for hazardous trees." Instead, he described it as paying attention to his surroundings as he's driving down the road. He said, "[M]y eyes aren't focused on the canopy, but if there's something that I observed then I would report it to Dave Ferrier." He denied having any qualifications to assess a tree for risks or hazards.

{¶26} Dave Ferrier, who was Rumpke's corporate facilities maintenance manager at the time of the accident, testified in his deposition that he drove down Buell Road daily as part of his position and, as he was driving through, he would check for anything out of the ordinary. This included checking for obviously dead trees and checking for any obvious concerns in areas where branches were lying in the road. The signs he looked for were no leaves, missing bark, or dead limbs on the ground. He denied having any qualifications to assess a tree for risks or hazards. However, once he or Mr. Riddle identified an "obvious tree," he would call a tree service to come out and look at the tree. He testified that, a lot of time, the tree service, "saw more that I didn't see, because that's his job, that's his profession[.]"

{¶27} John Butler, who was Rumpke's area engineer at the time of the accident, denied that Rumpke had any actual or constructive knowledge that the subject tree was defective or would otherwise cause harm to motorists along Buell Road.

{¶28} Rumpke's expert, Mark Webber, opined in his report that the subject ash tree did not have a defective condition that would be readily apparent to a property owner where photographs from the scene of the accident show that the tree was bark-covered and "contained no apparent sings of decay like fungal fruiting bodies." He further opined that a reasonable landowner would not have constructive knowledge of a defective condition of an ash tree based only on three small ash borer holes.

9

{¶29} In her response in opposition to summary judgment, Tauchert argued that issues of fact remained for trial where the evidence in the record showed that Rumpke should have observed the hazardous tree where, according to the opinion of her expert, Gregory Forrest Lester, the tree had visible signs that it was dead and was a hazard to the public where it lacked any real branch structure or leaves.

{¶30} In his report, Mr. Lester opined that the tree was "clearly rotted," lacked any smaller branch structure, had no leaves on it for several years, had three small emerald ash borer holes, and had fungus on the stump that had likely been present for at least three years. From this, he opined, "Given that the tree was dead for several years, its size, the hillside it was on and its location near the road, this tree was easily discoverable as a known hazard to any lay person and it should have been removed before it fell so that it did not fall onto the roadway as it did on October 28, 2018."

{¶31} When granting summary judgment in favor of Rumpke, the trial court relied on *Heckert*, 15 Ohio St.3d 402, to find, as a matter of law, that Rumpke did not have constructive notice of the defective condition of the subject tree where, "in light of the overwhelming evidence to the contrary," Mr. Lester's opinion did "not create a genuine issue of material fact." In other words, the trial court completely discounted Mr. Lester's opinion relying on the authority of *Heckert*.

{¶32} In *Heckert*, the complainants were injured when a tree limb fell from an adjoining property into their path while they were traveling on a motorcycle on a public highway. *Id.* at 402. The accident occurred in a rural county, in an area consisting mainly of farmland and forests areas. *Id.* The landowner testified that she had only been to the property once in recent years and was not aware of any previous incidents concerning limbs falling onto the roadway. *Id.* at 402-403. A horticulturist examined the tree and found that some of the limbs were rotten, and the deteriorated

condition of the tree's interior was visible. *Id.* at 403. He said that several limbs from the tree had already fallen and opined that the tree had been "in a stressful state for several years prior to the accident." *Id.* Conversely, a road supervisor with the county engineer's office, whose duties included patrolling a portion of the county highways and looking for conditions that would impair the safety of the roads, said that he had patrolled the highway in question at least twice a week in the immediate years prior to the accident, and the tree was in a green leafy condition and appeared to be in full health. *Id.* Further, the plaintiff's depositional testimony and the photographs in the record supported that the fallen limb had green foliage growing on it. *Id.*

{¶33} The Ohio Supreme Court held, as a matter of law, that the landowner did not have constructive notice of the defective condition of tree because, "[w]hile there was evidence by way of the horticulturist's affidavit that the tree had been dying for some time, this observation was made of the tree's interior after the limb had fallen. The affidavit provided no evidence that the condition could have been observed prior to the accident." *Id.* at 406.

{¶34} Here, unlike *Heckert*, Mr. Lester's opinion was not derived solely from observations made of the tree's *interior* after the tree fell. Rather, Mr. Lester's opinion was based on the stump he identified as belonging to the subject tree and conditions that purportedly existed and were visible on the *exterior* of the tree (lack of leaves, lack of smaller branch structure, fungus, and ash borer holes) at the time of the accident. Additionally, Mr. Webber admitted in his deposition that there was evidence of other ash trees in the area that had "succumbed" to an emerald ash borer infestation.

{¶35} Nevertheless, Rumpke argues that Mr. Lester's opinion, that was based on conditions that existed on the identified stump, should not be considered where Mr. Webber opined that, based on certain measurements of the stump and the subject

11

tree, the identified stump could not be the stump of the subject fallen tree. However, Mr. Lester responded to this assertion in an affidavit and explained his own opinion for why these measurements did not exclude the identified stump as the stump of the subject tree. This affidavit was sufficient to create an issue of fact for trial as to whether the identified stump was the stump belonging to the subject tree. It is not appropriate for a court to weigh the credibility of the evidence at the summary-judgment stage. *See, e.g., Environmental Solutions and Innovations, Inc. v. Edge Eng. & Science, LLC*, 2023-Ohio-2605, ¶ 8 (1st Dist.). Consequently, we hold that, even if 3200 Buell Road is rural in nature, genuine issues of material remain as to whether Rumpke had constructive notice of the defective condition of the subject tree.

{¶36} Second, even if 3200 Buell Road is urban in nature, genuine issues of material fact remain as to whether Rumpke met its duty of reasonable care.

{¶37} Rumpke moved for summary judgment arguing that, even if the property was urban, Rumpke "still would not be liable" because Tauchert failed to identify the stump of the subject fallen tree and there is no evidence to show that the fallen tree had any defective conditions. However, for the reasons already stated above, a genuine issue of material fact remains as to whether the stump identified by Tauchert was the stump of the subject fallen tree.

{¶38} Beyond that, when moving for summary judgment, Rumpke further argued that both experts agreed that it met its duty of reasonable care where Rumpke inspected and removed hazardous trees along Buell Road once a year. However, this assertion is not supported by the record.

{¶39} In his report, Mr. Webber stated that, based on conversations with Rumpke personnel, he learned that Rumpke hires a tree service "to perform drive-by inspections of the densely forested area along Buell Road where the accident

12

happened," and that receipts from the tree service show that it "routinely removed any trees that were identifiably hazardous or conspicuous," removing approximately 112 trees along Buell Road in a five-year period prior to the accident. From this information, he opined that Rumpke's actions in hiring the tree service complied with the "local standards of care as stated in Ohio law for landowners in this type of area (isolated or rural)."

{¶40} Additionally, Mr. Lester, in his deposition, agreed that Rumpke would be acting as a reasonable property owner by hiring a tree service once a year to inspect and cut down hazardous trees along Buell Road.

{¶41} Thus, if Rumpke did in fact have such a policy in place, then summary judgment may have been appropriate since both experts agreed that such actions would suffice to fulfill Rumpke's duty of care in relation to the hazardous trees abutting the road. However, there appears to be an uncorrected misunderstanding by Mr. Webber as Rumpke never asserted that it had such a policy in place. Instead, the evidence shows that Mr. Riddle and Mr. Ferrier would look for obvious dangers within the trees as they were driving through the area and then contact the tree service if they noticed an obvious concern. Then, the tree service would look at the identified tree and remove any hazardous trees in that area. No evidence was provided to show where this tree service had performed these limited assessments along Buell Road. Thus, this evidence does not equate to Rumpke routinely hiring a tree service "to perform drive-by inspections of the densely forested area along Buell Road where the accident happened." In fact, in his deposition, Mr. Ferrier—who admitted to being primarily responsible for tree removal—specifically denied that he ever called a tree service to inspect for any hazardous trees and denied any knowledge of anyone else ever calling a tree service to do any risk assessments. He further denied any knowledge that

13

Rumpke had "any other project or initiative to assess trees" for risks or hazards.  Mr. Riddle also denied, in his deposition, being aware of Rumpke doing anything other than his drive-bys to assess the risks of trees on its property.

{¶42}  Consequently, Rumpke failed to meet its burden to show that it met its duty of reasonable care as a matter of law.

{¶43}  Accordingly, because summary judgment was improper under either the rural or urban standard, we sustain the assignment of error and remand the cause for determination at trial.

### III. Conclusion

{¶44}  Having sustained the assignment of error, we reverse the judgment of the trial court and remand the cause for further proceedings consistent with this opinion and the law.

Judgment reversed and cause remanded.

**BERGERON, J.,** concurs separately.
**WINKLER, J.,** dissents.

**BERGERON, J.,** concurring separately.

{¶45}  I concur in the lead opinion's conclusion reversing the trial court's grant of summary judgment and remanding the cause for a jury to decide whether the tree that killed Mr. Tauchert fell in an urban or rural area and the issues of fact that remain under whichever standard applies.  But I write separately to take an axe to the outmoded and unworkable liability system that calls for judges and juries to determine what legal standard applies depending on the density of forests, to speculate about traffic flow based on the vibe of a particular street and its surroundings, and ultimately to draw rather arbitrary conclusions on the categorical urban versus rural distinction for tree-fall liability.  Simply put, this subjective, malleable inquiry can lead to widely

variable outcomes, and the original justification for the distinction in the context of tort law makes less and less sense as our cities and suburbs continue to sprawl. I thus believe it is time to abolish the categorical urban-rural distinction in this context.

**{¶46}** According to the Restatement of Law 2d, Torts, § 363 (1965), in cases where the natural conditions of a possessor's land causes an injury to someone outside of that land, the possessor is generally not liable for that physical harm, with one big exception—"A possessor of land in an *urban area* is subject to liability to persons using a public highway for physical harm resulting from his failure to exercise reasonable care to prevent an unreasonable risk of harm arising from the condition of trees on the land near the highway." (Emphasis added.) Restatement, § 363(1)-(2). In a comment, the Restatement authors justify the urban tree exception as follows:

> In an urban area, where traffic is relatively frequent, land is less heavily wooded, and acreage is small, reasonable care for the protection of travelers on the highway may require the possessor to inspect all trees [that] may be in such dangerous condition as to endanger travelers. It will at least require him to take reasonable steps to prevent harm when he is in fact aware of the dangerous condition of the tree.

Restatement, § 363, Comment e. Notably, the Restatement left open whether rural landowners should be held to the same standard, but it excluded them from the exception.

**{¶47}** Forty years ago, the Supreme Court of Ohio essentially adopted the Restatement rule and its categorical urban-rural distinction, holding that an "urban landowner, who has only a few trees," has a duty to inspect his trees near public roads for potential hazards to passersby, while a rural landowner has a duty of reasonable care to prevent harm to a lawful user of the road only if the owner has "'knowledge,

actual or constructive, of a patently defective condition of a tree which may result in injury to a traveler.'" *Heckert v. Patrick*, 15 Ohio St.3d 402, 404-405 (1984), quoting *Hay v. Norwalk Lodge No. 730*, 92 Ohio App. 14, 14 (6th Dist. 1951). Our court has since dutifully applied that distinction. *See, e.g., R&R Family Invests. v. Plastic Moldings Corp.*, 2016-Ohio-8125 (1st Dist.). But even in its own decision, the Supreme Court seemed to portend the future unworkability of the standard it was adopting: "In so doing, we recognize that the [urban-rural] distinction becomes a more difficult application with the rapid development of our suburban areas, and the increased amount of vehicular traffic in what might be considered the gray areas lying somewhere between the city and the more remote farm or rural area." *Heckert* at 405. Those predicted problems come to light in the case before us.

**{¶48}** To first set the stage a bit further—the Tauchert estate's appeal is one of many tree cases we have recently heard in this court. *See, e.g.*, *Chapel v. Wheeler Growth Co.*, 2023-Ohio-3988 (1st Dist.); *Fry v. City of Cincinnati*, 2022-Ohio-1248 (1st Dist.); *Korengel v. Little Miami Golf Ctr.*, 2019-Ohio-3681 (1st Dist.). No wonder—trees are (thankfully) present all over the First District and our state, covering about eight million acres, or about 30 percent of the Buckeye state's land. Ohio Department of Natural Resources Division of Forestry, *Ohio Statewide Forest Resource Assessment – 2020*, at 4 (2020), https://dam.assets.ohio.gov/image/upload/ohiodnr.gov/documents/forestry/plans/ OhioForestActionPlan-Forest-Resource-Assessment-2020.pdf (accessed August 6, 2024) [https://perma.cc/264E-YPTC]. At the county level, Hamilton County (which constitutes the entire First Appellate District) is about 32 percent forested, a much higher percentage than other urban counties like Franklin (10 percent) and Cuyahoga (19 percent), but significantly less than Ohio's Appalachian counties like Lawrence (79

16

percent) or Monroe (77 percent). *See Forest Resource Assessment* at 8. And at the municipality level, the City of Cincinnati, where the tree in this case fell and killed Mr. Tauchert, boasts a relatively high 38.8 percent tree canopy cover, with goals to grow that number. *Id.* at 18.

{¶49} My point is that trees are everywhere—in our densely populated cities, our sprawling suburbs, and more remote parts of the state. And with modern road networks widely connecting urban, suburban, and rural areas of our state more than ever before, unattended, rotting trees along roadways can pose threats to drivers and pedestrians no matter how densely populated the area may be with trees, buildings, or people.

{¶50} Nonetheless, as the law currently stands in Ohio, a landowner is held to a different tort liability standard depending on whether a judge or jury categorizes a specific spot on a road where an injury takes place as "urban" or "rural." *See Heckert*, 15 Ohio St.3d at 404-405. In making that determination, finders of fact have little guidance from the Supreme Court of Ohio—it loosely suggested several factors, including "the location of the highway, its size and type, as well as the number of people utilizing it." *Id.* at 406. In my view, that test is vague and subjective, and can be manipulated to fit whatever outcome the finders of fact may desire based on where their sympathies may lie. More importantly, the considerations delineated by the Court largely focus on how busy the particular road is—not the density or number of trees. As I drive around Hamilton County, I've come across many infrequently traveled roads—are these rural just because not too many people use them?

{¶51} The challenges of applying this test are on vivid display in the case before us. Mr. Tauchert died after a tree fell and struck the vehicle he was driving at approximately 3200 Buell Road in Cincinnati. Photos entered into evidence and

referenced by the lead opinion in this appeal show the immediate area densely populated by trees, with no buildings visible in the surrounding area. A quick check on Google Maps' Street View feature confirms this generally forested landscape, at least as of November 2022. The trial court concluded that this spot was rural, and it's easy to see the logic in its reasoning (even though, in my view, it usurped the jury's role as factfinder here).

{¶52} But drive just a few minutes southeast on Buell Road, and a driver will reach Interstate 275, the massive highway that encircles much of the Cincinnati metropolitan area. Past that highway to the south, the driver would reach the densely populated suburbs of Mt. Healthy Heights, Colerain Township, and Northbrook. And just a few minutes-drive away from where Mr. Tauchert was struck and killed, drivers will find the large shopping plazas, dozens of restaurants, and tens of thousands of homes that populate Cincinnati's western suburbs. In fact, the same unit of land owned by Rumpke, on the opposite side from where the tree fell and killed Mr. Tauchert, abuts one of those large suburban shopping centers and residential areas, just a few minutes-drive away, at the intersection of Interstate 275 and State Route 27. You can see the site of the incident and the surrounding area for yourself in the northwest corner of this Google Maps satellite screenshot below:



**{¶53}** So, while there are admittedly a bunch of trees along that road, the area is surrounded by an incredibly busy interstate as well as residential and shopping areas. I'm at somewhat of a loss as to how to draw a line between urban and rural areas that would approximate justice and satisfy state policy concerns in most cases, particularly in one of the most urban counties in the state. By leaving these terms undefined, Ohio's urban-rural distinction obfuscates what level of generality finders of fact should key-in on when deciding how responsible landowners need to act regarding potential hazards to passersby on roads abutting their property. Should juries rely on photos of the immediate area where the accident took place? Should they consider whether highly populated areas exist just around the bend? What about the density of trees in that square mile? Or in that municipality? Should they zoom out a bit and consider whether the township, city, or county, or region of the state

where the injury took place can be classified as "urban" or "rural" as a whole? What information, public or private, should they rely on in doing so?

**{¶54}** With all of these open questions and the widespread variety of outcomes possible from endless permutations of the categorial urban-rural test, courts and juries will inevitably stray away from our civil legal system's goals of consistency, clarity, and reasonableness. In Mr. Tauchert's case, justice, as much as it can exist for his family after his tragic death, might depend on each individual juror's (or judge's) hot take on what we mean by "rural" and "urban," with all the sociological baggage and linguistic implications that those terms may carry. That is not a system based on consistency, clarity, and reasonableness—it is one based on randomness, obfuscation, and subjectivity.

**{¶55}** I'm certainly not the first to recognize the antiquated notion of the urban-rural distinction. The Restatement of the Law 3d, Torts: Liability for Physical and Emotional Harm, § 54 (2012) (replacing § 363 of the Second Restatement) jettisons this distinction in favor of a test more focused on the commercial or residential use of the land, and, in general, "courts appear to be moving away from a strict application of Section 363." *R&R Family Invests.*, 2016-Ohio-8125, ¶ 16 (1st Dist.); *see* Restatement of the Law 3d, Torts: Liability for Physical and Emotional Harm, § 54, Comment c ("[A] trend exists toward expansion of the duties of land possessors to a general duty of reasonable care with regard to natural conditions."); *see also* James T.R. Jones, *Trains, Trucks, Trees and Shrubs: Vision-Blocking Natural Vegetation and A Landowner's Duty To Those Off The Premises,* 39 Vill.L.Rev. 1263, 1292 (1994) (arguing against the categorical urban-rural distinction and advocating for a general standard of reasonable care to all passersby).

**{¶56}** Although I do not take a position on the system that should replace the categorical urban-rural distinction, mainly because it was not briefed here and because the current system is binding precedent of our higher court, courts in other jurisdictions show potential ways forward. Most persuasively, some courts refuse to apply a categorical urban-rural approach (under which the focus of the test is on what category the land falls into, which in turn determines what legal duty or standard of care applies) and shift instead to a general standard of reasonable care under which every landowner has a duty to passersby on roads abutting their land. *See, e.g.*, *Gibson v. Hunsberger,* 109 N.C.App. 671, 675 (1993); *Willis v. Maloof*, 184 Ga.App. 349, 350 (1987); *Medeiros v. Honomu Sugar Co.*, 21 Haw. 155, 158-159 (1912); *Brandywine Hundred Realty Co. v. Cotillo*, 55 F.2d 231, 231 (3d Cir. 1931).

**{¶57}** Under such a system, factors (including some of those pondered by the *Heckert* Court decades ago) such as the frequency of travel on the road, the use of the land, and the number and nature of potential risks facing passersby could help determine whether the landowner's care of natural conditions affecting passersby was reasonable. *See Heckert*, 15 Ohio St.3d at 406; *Jones*, 39 Vill.L.Rev. at 1292 ("The rural/urban distinction drawn by some courts in natural condition duty cases is unnecessary. Even if a duty exists in rural settings, what is reasonable in an urban setting may not be reasonable in a rural one."); *Taylor v. Olsen*, 282 Or. 343, 348-349 (1978) (applying similar factors to determine reasonableness). This system would leave room to keep the standard that any landowner with actual or constructive notice of patently risky conditions could be found liable, *see Heckert* at 405, while striking a better, more flexible balance for overall landowner liability.

**{¶58}** Given the binding precedent of the Supreme Court, I concur in the lead opinion applying the categorical urban-rural distinction, and I agree that it is a close

question of fact that should have been left to the jury rather than being resolved by summary judgment. I thus concur in the majority opinion, but I strongly encourage the Supreme Court to reconsider the efficacy and wisdom of this test, decades after it first warned that it may become unworkable.

**WINKLER, J.,** dissenting.

{¶59} In this negligence action against Rumpke, a tree fell from Rumpke's forested property onto the scenic roadway below and struck Mr. Tauchert's vehicle. Mr. Tauchert eventually died as a result. In my opinion, Rumpke cannot be held liable for Mr. Tauchert's death as a matter of law, because Rumpke does not have a duty to inspect the thousands of trees on its property, and Rumpke did not have constructive notice of the defective condition of the particular tree prior to its fall. Therefore, I would affirm the trial court's decision granting summary judgment in favor of Rumpke, and I respectfully dissent.

{¶60} With regard to defective trees, the duty imposed on landowners in Ohio has remained unchanged in the 40 years since *Heckert v. Patrick*, 15 Ohio St.3d 402, 404 (1984). In determining a landowner's duty with respect to the condition of trees, the law recognizes a distinction between rural landowners and urban landowners. An urban landowner has a duty to exercise reasonable care to prevent injury to roadway travelers from defective trees, including a duty to inspect the trees. *Id.* at 405. By contrast, a rural landowner has no general duty to inspect trees adjacent to the roadway, but a rural landowner who has actual or constructive knowledge of the patently defective condition of a tree, which may result in injury to a roadway traveler, must exercise reasonable care to prevent the tree from falling. *Id.* In *Heckert*, the court stated that whether an area is rural or urban will depend upon factors such as

22

"the location of the highway, its size and type, as well as the number of people utilizing it[.]" *Id.* at 405-406.

{¶61} The trial court determined that Rumpke is a rural landowner under *Heckert*, and I agree. Buell Road where the incident occurred is a two-lane road, and Rumpke owns more than 1,160 acres of land in the area. The photographs and evidence submitted to the trial court of the area surrounding Buell Road show that the area is densely forested with few structures, and no sidewalks or mailboxes. Rumpke's expert testified that the area near 3200 Buell Road is steep and heavily wooded with 320 forested acres and approximately 48,000 trees. Mr. Tauchert's former girlfriend testified that Buell Road is not a main road, it "leads to nothing," and is a "scenic" road. After the tree fell on Mr. Tauchert's vehicle, another passerby did not find him until approximately 30 minutes later, which suggests that no one else traveled the roadway during that time. Therefore, the evidence regarding the character of the land near 3200 Buell Road where the incident occurred demonstrates that the land is rural, which makes Rumpke a rural landowner for purposes of this case.

{¶62} Mr. Tauchert's representative, the plaintiff in this case, argues that the trial court erred in determining that the Buell Road area is rural. The plaintiff points to land-use designations of the area made by Hamilton County and Colerain Township. Hamilton County has zoned the Buell Road area as "Heavy Industrial" on one side and "Residential" on the other. The Hamilton County Auditor classifies the Buell Road area as "Residential Vacant Land," and Colerain Township classifies the area as "Estate Residential District." The land-use designations are not relevant evidence of how a property is actually used for purposes of the *Heckert* analysis. For example, an area could be designated as commercial, but if nothing has been built on the property, the area surrounding the property is rural, and if very few people ever

use the roadways on the property, the area would not be considered urban under *Heckert*.

{¶63} Given that no genuine issue of material fact exists as to the rural nature of Rumpke's property adjacent to Buell Road, Rumpke had no general duty to inspect the subject property for defective trees. The question then becomes whether Rumpke had notice of the defective condition of the tree that fell on Mr. Tauchert's vehicle. The parties agree that Rumpke did not have actual notice of any defective condition of the tree; however, constructive notice of a hazardous or defective tree can be imputed to a rural landowner if the hazard or defect is patent. *Heckert*, 15 Ohio St.3d at 405. "Problems discoverable only upon inspection are not patently obvious." *Ankeny v. Vodrey*, 1999 Ohio App. LEXIS 4553, *13 (7th Dist. Sep. 23, 1999).

{¶64} The hazardous nature of the particular tree that fell on Mr. Tauchert's vehicle was not patently obvious. No one observed this particular tree prior to its fall. This is not surprising, because the area surrounding 3200 Buell Road where the tree fell is steep and heavily forested. Furthermore, Rumpke's landfill manager testified that he performed daily drive-by inspections of the area where the tree fell, and that if he noticed anything amiss with any of the trees, such as leaning or missing bark, Rumpke would contact a tree-services company. Finally, the pictures taken by police the day of the incident show the fallen tree trunk covered by bark.

{¶65} In attempt to demonstrate constructive notice on Rumpke's part, the plaintiff relies on expert testimony from arborist Gregory Forrest Lester, who opined that the defective condition of the tree would have been easily discoverable given its size and location near Buell Road. Lester's expert opinion is not relevant evidence as to whether Rumpke had constructive notice of the defective condition of the tree. Whether a landowner such as Rumpke had constructive notice of a patent or apparent

defective condition of a tree on the property should be viewed from the standpoint of a reasonable layperson, and not that of an expert arborist. Just because the defective condition of a tree is "discoverable" according to an expert does not make it patent or apparent to a layperson on the roadway prior to the tree's fall.

{¶66} Based on the evidence in the record that Rumpke's property near 3200 Buell Road where the incident occurred is rural, meaning Rumpke had no general duty to inspect its property for defective trees, and no one observed the defective tree before it fell, Rumpke did not have constructive notice that the particular tree that fell on Mr. Tauchert's vehicle was a danger to travelers on Buell Road. The conclusory, post-accident statement from plaintiff's expert that the defective condition of the tree was "discoverable" does not, alone, create a genuine issue of material fact as to constructive notice. Therefore, I would affirm the trial court's decision granting summary judgment in favor of Rumpke.

Please note:

The court has recorded its own entry this date.