[Cite as *Branson v. Fifth Third Bank, N.A.*, 2025-Ohio-4396.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

KELLE G. BRANSON, Executor of the Estate of Charles Branson,

     Plaintiff-Appellant,

  vs.

FIFTH THIRD BANK, N.A.,

     Defendant-Appellee.

APPEAL NO. C-240558
TRIAL NO. A-2200479

*JUDGMENT ENTRY*

This cause was heard upon the appeal, the record, and the briefs.

The judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 9/19/2025 per order of the court.**

**By:**_____
     **Administrative Judge**

[Cite as *Branson v. Fifth Third Bank, N.A.*, 2025-Ohio-4396.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |  |
|---|---|---|---|
| KELLE G. BRANSON, Executor of the Estate of Charles Branson, | : | APPEAL NO. | C-240558 |
|  |  | TRIAL NO. | A-2200479 |
| Plaintiff-Appellant, | : |  |  |
|  | : |  |  |
| vs. | : |  |  |
|  | : | *O P I N I O N* |  |
| FIFTH THIRD BANK, N.A., | : |  |  |
| Defendant-Appellee. | : |  |  |
|  | : |  |  |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 19, 2025

*Adams Law, PLLC*, *Jeffrey C. Mando* and *Daniel E. Linneman*, for Plaintiff-Appellant,

*Vorys, Sater, Seymour & Pease LLP*, *Victor A. Walton, Jr.,* and *Jacob D. Mahle*, for Defendant-Appellee.

**Воск, Judge.**

{¶1} Defendant-appellee Fifth Third Bank, N.A., ("Fifth Third") gave Charles Branson an asset-secured line of credit ("ASLOC") backed by Branson's various stocks and bonds ("the Assets"). Fifth Third simultaneously agreed to manage the Assets on Branson's behalf. The contracts governing the ASLOC (the "Loan Agreements") limited the amount of money that Branson could draw from the ASLOC to no more than 80 percent of the value of the Assets. Almost immediately after Fifth Third gained control over the Assets, the stock market crashed and the value of the Assets fell well below the value of Branson's ASLOC. Fifth Third liquidated the Assets. Branson sued, claiming the liquidation cost him millions. The trial court granted summary judgment in Fifth Third's favor.

{¶2} We affirm because the evidence shows that Fifth Third was entitled to summary judgment on Branson's claims for breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty and conflict of interest.

{¶3} First, Fifth Third did not breach the agreement in which Branson pledged the Assets as collateral for the loan. This agreement expressly allowed Fifth Third to liquidate the Assets if the money owed on the line of credit exceeded 80 percent of the value of the Assets. It also granted Fifth Third the power to construe any terms inconsistent amongst the loan documents in its favor. And while the pledge agreement allowed Branson to provide additional collateral to bring his loan into compliance, Branson did not offer the type of collateral that the pledge agreement required. Finally, any oral agreement contradicting a contract's terms cannot be considered under the parol evidence rule.

{¶4} Second, the evidence shows that Fifth Third did not breach its duty of good faith. Fifth Third complied with the terms of the loan documents.

3

**{¶5}** Finally, the evidence compels us to reject Branson's claim for breach of fiduciary duty. Nothing in the loan documents prevented Fifth Third from selling the Assets or shows that Fifth Third breached any duty.

**{¶6}** We overrule Branson's assignments of error and affirm the trial court's judgment.

## I. Factual and Procedural History

### A. Procedural history

**{¶7}** In February 2022, Branson sued Fifth Third and asserted claims for breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty.

**{¶8}** Following discovery, Fifth Third moved for summary judgment on all claims. The trial court referred the case to a magistrate, who heard oral arguments and later issued a decision granting judgment in Fifth Third's favor on each of Branson's claims. Branson objected. While Branson's objection was pending, Branson passed away and his wife, plaintiff-appellant Kelle G. Branson, was substituted as plaintiff.

**{¶9}** The trial court overruled Branson's objections. This court dismissed Branson's initial notice of appeal because the trial court had failed to adopt, modify, or reject the magistrate's decision and enter a judgment. The trial court subsequently adopted the magistrate's decision and entered judgment for Fifth Third on all counts. Branson appealed.

### B. Facts[1]

**{¶10}** In 2012, Charles Branson retired and sold his barge-repair business for $15 million. He invested the money from the sale with Tom Nerney, a financial advisor

---

[1] All references to "Branson" in the statement of facts refer to Charles Branson.

with Sun Trust. Branson moved his investment accounts to German American Bank and obtained an ASLOC secured by the Assets.

### 1. December 2019: Branson moves his money to Fifth Third

**{¶11}** In 2019, Branson reached out to Nerney, who then worked at Fifth Third, about moving his banking relationship to Fifth Third. In December 2019, Fifth Third flew several employees to Branson's home in South Carolina to discuss bringing Branson's business to Fifth Third.

**{¶12}** Fifth Third's personnel explained to Branson that the loan-to-value ratio ("LTV") on his ASLOC at his bank currently exceeded Fifth Third's normal limit of 70 percent. At the time, Branson owed $5.4 million on his ALSOC and the Assets were valued at approximately $6.8 million, so the LTV on Branson's loan was around 78-79 percent. Despite Branson's LTV being greater than typically allowed, Fifth Third and Branson agreed to permit him to maintain an ASLOC with an LTV of up to 80 percent. But this exception was limited to 120 days, during which Fifth Third would work with Branson to deleverage his LTV to 70 percent or lower.

**{¶13}** Branson signed an Investment Management Agreement ("Investment Agreement"), which provided Fifth Third authority to manage the Assets on Branson's behalf. Fifth Third paid off Branson's ASLOC at German American Bank and began securing the Assets.

### 2. Loan Documents

**{¶14}** In late January 2020, Branson signed several other documents related to his Fifth Third ASLOC: a Consumer Note ("Note"), an Account Control Agreement, a Pledge Agreement, and a Collateral Margin Addendum ("Addendum") (collectively, the "Loan Documents").

### a. The Note

**{¶15}** In conformity with the plan that Branson and Fifth Third discussed in December 2019, the Note matured in 120 days. The Note outlined events of default, including (1) Branson's breach of "any warranty or agreement . . . herein contained, or contained in any mortgage or security agreement" contained in the Loan Documents; and (2) Fifth Third's "reasonable determination . . . at any time that it is inadequately secured hereby with respect to any of [Branson]'s obligations to [Fifth Third]."

**{¶16}** Upon an event of default, the Note provided that "Lender may at any time, without notice, apply the Collateral to this Note or such other Obligations, whether due or not." The Note further stated that, upon default, Fifth Third would become attorney-in-fact with power to sell collateral securing the loan.

### b. The Pledge Agreement

**{¶17}** Under the Pledge Agreement, Branson granted Fifth Third a security interest in the Assets, which were managed by Fifth Third under the Investment Agreement, as collateral to secure the Note. The Pledge Agreement required that the Assets retain a minimum fair market value. Moreover, if the Assets' value fell below that limit, Branson had to provide Fifth Third "cash in an amount, or readily available marketable securities" to increase the value of the Assets to the minimum value. The Pledge Agreement rendered Branson in default if the Assets' value fell below the minimum value and he failed to provide additional cash or marketable securities within three days.

**{¶18}** The Pledge Agreement included an integration clause stating that it "and the other Loan Documents are the entire agreement, and supersede any prior agreements and contemporaneous oral agreements." Finally, under the Pledge Agreement, if "there is any conflict, ambiguity, or inconsistency, in [Fifth Third]'s

6

judgment, between the terms of this Agreement and any of the other Loan Documents, then the applicable terms and provisions, in [Fifth Third]'s judgment, providing [Fifth Third] with the greater rights, remedies, powers, privileges, or benefits will control."

### c. Addendum

**{¶19}** The Addendum set the acceptable LTV for Branson's loan based on the type of collateral held in his investment account. The Addendum set the LTV for stocks and bonds—the type of collateral comprising the Assets—at 80 percent, consistent with the parties' agreement to allow Branson an exception to Fifth Third's customary 70-percent ratio. The Addendum added an event of default: Branson would be in default of the Loan Documents if he failed to maintain sufficient collateral as required by the Addendum. In the event of default, the Addendum permitted Branson to cure by either pledging additional "Marketable Collateral" or reducing the balance on the Note.

### 3. Branson immediately defaulted due to the COVID-19 market crash and Fifth Third liquidated the Assets

**{¶20}** Fifth Third received the Assets from German American Bank in late February 2020. By that time, the Assets' value had depreciated such that the ASLOC's LTV was at 89 percent. Branson concedes that this resulted in a breach of the Loan Documents.

**{¶21}** After the Assets arrived, Fifth Third investigated opening a home-equity line of credit ("HELOC") on Branson's home in Hilton Head, a plan the parties had discussed in their December 2019 meeting to reduce the LTV. But Fifth Third discovered that German American Bank had liens on the home, precluding a HELOC.

**{¶22}** According to Fifth Third, after it determined that the Assets' value had diminished, two employees called Branson on March 5, 2020, to inform him he was in

default and to tell him that they would reduce the ASLOC's LTV by selling the securities comprising the Assets. Branson instructed Fifth Third to hold off because he wanted to take his account to another bank. Branson testified in his deposition that he did not remember this call occurring.

{¶23} The record contains a March 6, 2020 email from a Fifth Third employee to Branson, which stated that he wanted to recap their conversation from the day before. It discussed the LTV, the fact that Branson could not obtain a HELOC due to his home being encumbered, and that because a HELOC was impossible, they would have to sell about $1 million from the Assets to pay down the ASLOC's balance.

{¶24} About a week later, the COVID-19 pandemic created a market crash, causing the Assets to lose significant value. By the time the parties spoke on March 18, 2020—the parties agree that this conversation occurred—the Assets had further depreciated and were valued at around $5 million. As such, Branson owed Fifth Third approximately $400,000 more than the value of the Assets.

{¶25} While the parties agree that they spoke on March 18, they disagree on the content of the call. Fifth Third asserts that Branson agreed to liquidate the Assets. Branson denies that assertion and instead claims that he offered as collateral real property in Henderson, Kentucky. According to Branson's expert, he owned other assets worth approximately $2 million.

{¶26} Later on March 18, Fifth Third liquidated the Assets. It maintained the cash from the liquidation in Branson's investment account. According to Branson's proffered expert, Branson lost more than $3 million due to Fifth Third liquidating the Assets.

## II. Analysis

{¶27} Branson raises three assignments of error challenging the trial court's

granting Fifth Third summary judgment on his three claims.

{¶28} This court reviews a trial court's summary-judgment ruling de novo. *Weckel v. Cole + Russell Architects, Inc.*, 2024-Ohio-5111, ¶ 33 (1st Dist.). And although appellate courts typically apply an abuse-of-discretion standard when reviewing a trial court's adoption, rejection, or modification of a magistrate's decision, we review a trial court's adoption of a magistrate's summary-judgment decision de novo. *Long v. Noah's Lost Ark, Inc.*, 2004-Ohio-4155, ¶ 17 (7th Dist.); *see Husa v. Knapp*, 2020-Ohio-6986, ¶ 21 (9th Dist.); *see also Edelstein v. Edelstein*, 2023-Ohio-2503, ¶ 12 (1st Dist.) ("[W]here the appeal from the trial court's action on a magistrate's decision presents only a question of law, the standard of review is de novo."); *Yates v. Estate of Ferguson*, 2010-Ohio-892, ¶ 7 (1st Dist.) ("Further, a ruling on summary judgment poses a question of law that is subject to a de novo standard of review.").

{¶29} Under Civ.R. 56(C), a trial court shall grant summary judgment where (1) there are no genuine issues of material fact, (2) the movant is entitled to judgment as a matter of law, and (3) when viewing the evidence most strongly in the nonmovant's favor, reasonable minds can come to one conclusion, and that conclusion is adverse to the nonmovant.

{¶30} A party seeking summary judgment bears the burden of informing the trial court of the basis for its motion and identifying evidence in the record that demonstrates the "'absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.'" *Weckel* at ¶ 34, quoting *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). If the movant satisfies this burden, the nonmoving party must "'set forth specific facts showing that there is a genuine issue for trial.'" *Id.*, quoting *Dresher* at 293. Courts considering summary-judgment motions may not

weigh the evidence or evaluate credibility because the purpose of summary judgment is to determine whether disputed issues of material fact exist. *Id.*

## A. Breach of contract

**{¶31}** In his first assignment of error, Branson argues that the trial court erred in granting summary judgment to Fifth Third on his breach-of-contract claim, which involved only the Pledge Agreement. He asserts that Fifth Third breached the Pledge Agreement by (1) failing to provide him ten days' notice before selling the collateral, (2) failing to allow him to "top up" the collateral, and (3) not honoring the "Grace Period Agreement."

### 1. Contract-interpretation principles

**{¶32}** A court's primary goal in interpreting a contract is to give effect to the parties' intentions, which we presume are expressed in the terms of the contract itself. *Hartford Fire Ins. Co. v. Debra-Kuempel, Inc.*, 2024-Ohio-5830, ¶ 23 (1st Dist.). Courts give contract terms their plain and ordinary meaning unless another meaning is evidenced from the "face or overall contents of the instrument." *Sutton Bank v. Progressive Polymers, L.L.C.*, 2020-Ohio-5101, ¶ 15. "We read contracts as a whole and whenever reasonable, we give effect to each provision within a contract." *Hartford* at ¶ 24.

**{¶33}** When faced with contractual provisions that "are arguably in conflict, we apply the more specific provision." *Marusa v. Erie Ins. Co.*, 2013-Ohio-1957, ¶ 14. But "[w]e cannot 'wholly disregard' a provision of a contract as being inconsistent with another unless no other reasonable construction is possible." *Hartford* at ¶ 24, quoting *Marusa* at ¶ 8.

### 2. Fifth Third did not breach the Pledge Agreement

**{¶34}** Branson conceded in his complaint, his deposition, and his briefing

that, by the time Fifth Third obtained control over the Assets, the LTV had risen above the 80-percent threshold set out in the Loan Documents. And he does not dispute that his carrying an LTV above 80 percent was an event of default. Accordingly, the only issue is whether Fifth Third had authority under the Loan Documents to liquidate the Assets on March 18, 2020.

a. <u>Ten-days' notice provision</u>

**{¶35}** Branson asserts that Fifth Third failed to comply with Section 6(a)(iv) of the Pledge Agreement, which provided, "[a]fter the occurrence of an Event of Default . . . [Fifth Third] is hereby authorized and empowered, at its election . . . (iv) to sell in one or more sales after 10 days' notice (which notice [Branson] hereby agrees is commercially reasonable) but without any previous notice or advertisement, the whole or any part of the [Assets]." He asserts Fifth Third did not provide notice of its intent to sell the Assets until March 18, 2020.

*i. Branson did not remember receiving notice*

**{¶36}** Branson argues that a dispute of fact exists involving whether Fifth Third provided proper notice as required by the Pledge Agreement because he denies that he spoke with Fifth Third employees on March 5, 2020, contradicting a Fifth Third employee's testimony that he notified Branson on March 5, 2020, that Fifth Third would liquidate the Assets.

**{¶37}** Branson initially testified that he did not remember speaking with Fifth Third on March 5. Then, he asserted that a Fifth Third employee "did not" speak with him on March 5. But when Fifth Third's counsel asked, "You're sure he didn't, or you don't recall," Branson responded, "Yeah. I don't recall."

**{¶38}** Like the March 5 call, Branson testified that he did not recall receiving the March 6, 2020 email, which expressly told Branson that Fifth Third planned to sell

the Assets. Branson did, however, confirm that the email address on the "send" line was his email.

**{¶39}** A statement that one cannot remember an event occurring generally is insufficient to establish a genuine dispute as to whether that event occurred. *Wells Fargo Bank, N.A. v. Goebel*, 2014-Ohio-472, ¶ 19 (2d Dist.); *see Discover Bank v. Combs*, 2012-Ohio-3150, ¶ 20 (4th Dist.); *see also State ex rel. Mike v. Warden of Trumbull Corr. Inst.*, 2003-Ohio-2237, ¶ 10-11 (11th Dist.).

**{¶40}** Branson testified both that there was no call between him and Fifth Third on March 5 and that he could not remember a March 5 call. But Branson did not deny receiving the March 6 email; instead, he testified he did not remember receiving the March 6 email, despite the send line bearing his correct email address.

**{¶41}** Because Branson merely could not remember one or both of the communications confirming that Fifth Third notified him about its plan to sell the Assets, there is no genuine issue of material fact that Fifth Third provided ten days' notice before selling the Assets.

## ii. *The Note did not require any notice*

**{¶42}** Even if Branson had established a disputed fact involving whether Fifth Third provided notice on March 5 or 6, under the Note's clear language, Fifth Third was not required to give notice before selling the Assets. And the Pledge Agreement allowed Fifth Third to choose the Note's terms over the Pledge Agreement's terms in the event of a conflict between the documents.

**{¶43}** As a remedy for a default—and Branson concedes he was in default—the Note stated, "Lender may at any time, without notice, apply the Collateral to this Note or such other Obligations, whether due or not." The Note appointed Fifth Third attorney-in-fact in the event of default and gave it the power to "collect, sell, assign,

12

transfer and deliver all of said Collateral or any part thereof . . . through any private or public sale without either demand or notice to Borrower."

**{¶44}** Branson acknowledges that the Note did not require Fifth Third to provide notice before selling the Assets. He argues that the terms of the Note and the Pledge Agreement conflict, and that the Pledge Agreement, as the more specific document, controls.

**{¶45}** Accepting Branson's argument that the Note's terms conflict with the Pledge Agreement's terms, the Loan Documents specifically contemplated that such a conflict may occur and provided Fifth Third the ability to select the operative provision. The Pledge Agreement stated that if "there is any conflict, ambiguity, or inconsistency, in [Fifth Third]'s judgment, between the terms of this Agreement and any of the other Loan Documents, then the applicable terms and provisions, in [Fifth Third]'s judgment, providing [Fifth Third] with the greater rights, remedies, powers, privileges, or benefits will control."

**{¶46}** While Branson generally complains about Fifth Third's picking and choosing which contract provisions apply, he makes no argument that the Pledge Agreement's choice-of-terms provision is unenforceable. The clear language of the Pledge Agreement anticipates conflicts between the Loan Documents and provides Fifth Third the power to select the most favorable contract term amongst the Loan Documents. It exercised that power and chose the Note's notice terms, which did not require Fifth Third to provide notice before selling the Assets. Branson's notice argument fails.

      b.    <u>"Top-up" agreement</u>

**{¶47}** Next, Branson asserts Fifth Third breached the Pledge Agreement by not allowing him to pledge additional collateral to bring his LTV into compliance with

the Loan Documents.

{¶48} Section 2 of the Pledge Agreement provided Branson would be in default if the Assets' value fell below the established minimum value and he failed to provide "cash in an amount, or readily available marketable securities . . . to bring the fair market value of the Interest up to the Minimum Value." Branson claims Fifth Third breached this provision by refusing his offer of additional assets.

{¶49} But the plain language of the Pledge Agreement allowed Branson to cure a default only with "cash . . . or marketable securities." Branson's deposition testimony established that he offered only real estate as collateral, not "cash" or "marketable securities."

{¶50} On appeal, Branson asserts that he offered "real estate and another investment account, worth around $200,000." But a review of Branson's deposition reveals that he offered to pledge as collateral his real property in Henderson, Kentucky. He agreed that the assets in Henderson were not cash, stocks, or bonds. And when Fifth Third's counsel asked to "clarify the record . . . Did you mention [to Fifth Third] any other assets besides the real estate," Branson responded, "No."

{¶51} Branson testified that he "could have used . . . [t]he Baird account" to "top up." He testified that the Baird account was worth between $175,000 and $200,000. But Branson admitted that he did not offer to transfer that account to Fifth Third or write a check against that account.

{¶52} Branson presented no evidence that he offered to pledge additional "cash . . . or marketable securities" sufficient to cure his default. Fifth Third did not breach this provision of the Pledge Agreement.

c. The parol evidence rule bars the "grace period" agreement

{¶53} Finally, Branson argues that Fifth Third breached an oral "Grace Period

Agreement" under which Fifth Third agreed to allow Branson 120 days to reduce his LTV without liquidating the Assets.

### i. *The parol evidence rule*

**{¶54}** The parol evidence rule is a substantive rule of law defining a contract's limits: where the parties' agreements are memorialized in a final writing, any other agreements—written or oral—are excluded. *Galmish v. Cicchini,* 90 Ohio St.3d 22, 27 (2000). Absent "'fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements.'" *Id.,* quoting 1 *Williston on Contracts*, § 33:4, at 569-570 (4 Ed. 1999).

**{¶55}** A written agreement appearing to be complete and unambiguous on its face is presumed to embody the whole agreement between the parties. *P.J. Lindy & Co. v. Savage,* 2019-Ohio-736, ¶ 25 (6th Dist.), quoting *Fontbank, Inc. v. CompuServe, Inc.,* 138 Ohio App.3d 801, 808 (10th Dist. 2000). But a court may consider evidence of a collateral oral contract when its subject matter is not embodied in the written contract, does not conflict with the parties' written agreement, and covers matters outside of, but related to, the parties' written agreement. *Bollinger, Inc. v. Mayerson,* 116 Ohio App.3d 702, 712 (1st Dist. 1996).

### ii. *Evidence of an oral contract is barred*

**{¶56}** To prove the existence of the grace-period agreement, Branson points to Nerney's deposition testimony in which Nerney explained that Branson "was well aware of the plan and the plan was, we would give a little bit of a grace period, which was the four-month, I guess, as per the document." Nerney continued,

> So the note was in place for four months. So that means in those four
> months, we have the time to bring over the assets, work the portfolio

and, you know, execute the plan.

And then after four months, then we have to look at the loan again and say, Are we going to renew, are we going to pay off, what are we going to do? So for those four months, it allows us the time to, you know, work with the client.

{¶57} Branson argues that this testimony, along with Fifth Third employees consistently referring to the "plan" for Fifth Third to work with Branson during the 120-day term of the Note to reduce Branson's LTV, establishes that Fifth Third agreed to provide Branson a full 120 days to deleverage the LTV before selling the Assets.

{¶58} First, it is not clear that Nerney's testimony established that Fifth Third offered a 120-day grace period. But assuming without deciding that Nerney's testimony, along with evidence of "the plan," established that Fifth Third had agreed to provide Branson a 120-day grace period before selling the Assets, that evidence is barred by the parol evidence rule.

{¶59} The Loan Documents represent a complete agreement. The Pledge Agreement stated that it "and the other Loan Documents are the entire agreement, and supersede any prior agreements and contemporaneous oral agreements."

{¶60} Branson signed multiple documents, including the Investment Agreement, the Note, the Pledge Agreement, the Collateral Margin Addendum, and an Account Control Agreement. These documents explicitly set out Branson's and Fifth Third's rights and obligations involving Branson's ASLOC with Fifth Third, his pledge of the Assets as collateral for the ASLOC, and Fifth Third's management of the Assets. The Note, Pledge Agreement, and Collateral Margin Addendum collectively provided Fifth Third the ability to sell the Assets in the event that Branson's LTV exceeded 80 percent for more than three days.

**{¶61}** Any oral contract requiring a 120-day grace period before Fifth Third liquidated the Assets would (1) cover the same subject matter as the Loan Documents, (2) conflict with the Loan Documents, and (3) govern no matters outside of, but related to, the Loan Documents. Branson's argument that the "Grace Period Agreement" precluded Fifth Third from enforcing the Loan Documents' remedies for 120 days is contrary to the parties' written agreement. The trial court, and this court on appeal, cannot consider any evidence of the grace-period agreement because it is barred by the parol evidence rule.

**{¶62}** We overrule Branson's first assignment of error because all parties agree that Branson's LTV exceeded 80 percent for more than three days. And the Loan Documents authorized Fifth Third to do exactly what it did—liquidate the Assets.

## B. Duty of good faith and fair dealing

**{¶63}** In his second assignment of error, Branson asserts that the trial court erred in granting summary judgment on his claim for breach of the duty of good faith and fair dealing.

**{¶64}** Every contract contains an implied duty of good faith and fair dealing. *Littlejohn v. Parrish*, 2005-Ohio-4850, ¶ 22 (1st Dist.). And a party breaches the "contract if it fails to act in good faith." *Id.* at ¶ 24. This implied duty of good faith and fair dealing requires the "parties to act in good faith and to deal fairly with each other. Any agreement—whether a lease, a secured loan, or something else—has an implied covenant of good faith and fair dealing that requires not only honesty but also reasonableness in the enforcement of the contract." *Id.* at ¶ 27. The implied duty of good faith and fair dealing typically applies where one party possesses "discretionary authority to determine certain terms of the contract" or the contract otherwise provides one party with discretion in the performance of the terms of the contract. *Id.*

at ¶ 25, quoting *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995).

**{¶65}** But the duty of good faith and fair dealing does not preclude a party from exercising its rights under the express terms of a contract. *Great Water Capital Partners, LLC v. Down-Lite Internatl., Inc.*, 2015-Ohio-4877, ¶ 14 (1st Dist.). As the Supreme Court of Ohio has explained, the duty of good faith and fair dealing "'is not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document.'" *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 443 (1996), quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).

**{¶66}** Branson asserts that Fifth Third breached its duty of good faith, citing evidence that Fifth Third "made an exception to its LTV guidelines" to induce Branson to bring his business to Fifth Third, while knowing that Branson's LTV was near the 80-percent threshold. Branson also claims that Fifth Third failed to explain to him that it could declare a default despite the LTV-guideline exception within 120 days.

**{¶67}** Branson's claim fails because Fifth Third acted in compliance with the express terms of the Loan Documents when it liquidated the Assets. Those terms permitted Fifth Third to liquidate the Assets if Branson's LTV exceeded 80 percent. Branson does not dispute that he was in breach of the Loan Documents because his LTV exceeded 80 percent. That breach permitted Fifth Third access to the various remedies for default set out in the Loan Documents, including liquidation of the Assets.

**{¶68}** Branson also claims that Fifth Third failed to explain that it could liquidate the Assets before the 120-day grace period expired. But Branson signed a written contract expressly providing that Fifth Third had the right to liquidate the Assets after a three-day default, and parties are expected to read contracts before

signing them. *Downing v. Downing*, 2023-Ohio-2673, ¶ 36 (1st Dist.).

**{¶69}** Fifth Third did not breach the implied duty of good faith and fair dealing by selling the Assets according to the terms of the Loan Documents. We overrule Branson's second assignment of error.

## C. Breach of fiduciary duty

**{¶70}** Branson's third assignment of error argues that the trial court erred by granting summary judgment to Fifth Third on his claim for breach of fiduciary duty.

**{¶71}** To prove a claim for breach of fiduciary duty, a party must show "'(1) the existence of a duty arising from a fiduciary relationship, (2) the failure to observe the duty, and (3) an injury proximately resulting.'" *White v. Pitman*, 2020-Ohio-3957, ¶ 31 (1st Dist.), quoting *Vontz v. Miller*, 2016-Ohio-8477, ¶ 28 (1st Dist.). "A 'fiduciary' is 'a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking.'" *Health Alliance of Greater Cincinnati v. Christ Hosp.*, 2008-Ohio-4981, ¶ 20 (1st Dist.), quoting *Groob v. KeyBank*, 2006-Ohio-1189, ¶ 16. A broker or financial advisor has a fiduciary relationship with the advisor's clients. *Mathias v. Rosser*, 2002-Ohio-2772, ¶ 18 (10th Dist.) (collecting cases).

**{¶72}** A fiduciary owes a duty of loyalty to its principal, requiring the fiduciary to act solely in the best interest of the principal. *Cundall v. U.S. Bank, N.A.*, 2007-Ohio-7067, ¶ 26 (1st Dist.), *rev'd on other grounds*, 2009-Ohio-2523.

**{¶73}** Fifth Third had a fiduciary duty to act in Branson's best interest. But Fifth Third did not breach any duty owed to him by reason of that relationship because Fifth Third did not engage in any self-dealing.

**{¶74}** Branson asserts that the trial court erred in requiring that he present evidence of Fifth Third's self-dealing because self-dealing is not a necessary element

of a breach-of-fiduciary-duty claim. While Branson is correct that, broadly speaking, breach-of-fiduciary-duty claims can be grounded in actions other than self-dealing or self-interested actions, Branson's complaint alleged that "Fifth Third breached its fiduciary duty to Branson by wrongfully selling the Collateral without proper notice to Branson and by acting to protect and serve its own self-interest in direct conflict with . . . Branson's best interests." Branson accordingly framed his claim as one involving Fifth Third's self-dealing. The trial court did not err in requiring Branson to present evidence to support the allegations in his complaint. *See Karsnak v. Chess Fin. Corp.*, 2012-Ohio-1359, ¶ 48 (8th Dist.) ("Generally, a plaintiff cannot enlarge her claims during a defense to a summary judgment motion and is limited to the allegations of her pleading."); *see also Bryan v. Valley Care Health Sys. of Ohio Northside*, 2016-Ohio-7156, ¶ 36 (11th Dist.) (same).

{¶75} Branson argues that he presentED evidence of Fifth Third's self-dealing through the affidavit and proffered Elyon H. Davis's expert opinion. Davis opined that Fifth Third breached its fiduciary duty to Branson "by liquidating his portfolio without providing the required 10-day notification and neglecting to implement the agreed upon plan to protect Mr. Branson." This assertion fails because (1) as explained above, the Pledge Agreement and Note collectively allowed Fifth Third to sell the Assets without notice, and (2) by the time Fifth Third obtained control over the Assets in late February 2020, the LTV was already above 80 percent, rendering Branson in default under the Loan Documents. Fifth Third could not have failed to implement "the plan" before Branson's default under the contract. Further, Fifth Third did not apply the cash from the sale of the Assets to the balance of its loan; instead, it held the cash earned by selling the Assets in Branson's investment account, so it did not derive a direct benefit from the liquidation.

**{¶76}** We pause to note that Fifth Third argues that it was not a party to the sale of the collateral—it did not purchase Branson's assets—so it cannot have engaged in a conflicted transaction. But to the extent that Fifth Third sold the Assets to protect its position as a secured creditor, it arguably acted in conflicting positions as both a secured lender and a manager of the Assets.

**{¶77}** Branson, however, did not develop an argument that Ohio's fiduciary-duty law precludes a fiduciary such as Fifth Third from entering into a loan transaction like the one at issue here, and we decline to develop such an argument on Branson's behalf. *See Guthrie v. Guthrie*, 2024-Ohio-5581, ¶ 12 (1st Dist.).

**{¶78}** We overrule the third assignment of error.

### *III. Conclusion*

**{¶79}** For the foregoing reasons, we overrule Branson's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

**Moore, J.,** concurs.
**Zayas, P.J.,** concurs in part and dissents in part.

**Zayas, P.J.,** concurring in part and dissenting in part.

**{¶80}** I concur in the majority's opinion on the first and second assignments of error. However, I must dissent from the majority opinion on the third assignment of error because dismissal at the summary-judgment stage was not appropriate and the breach-of-fiduciary-duty claim should proceed to be determined by the trier of fact.

**{¶81}** Charles Branson worked in the barge-repair business for 42 years. In 2012, he retired and sold his long-term business for $15 million and invested a substantial amount of the net proceeds in stocks and bonds. Eventually, in 2019 while seeking to switch banks, he reached back out to the person who initially assisted him

with investing the proceeds from the sale of his business. This individual, now employed by Fifth Third, flew to Branson's home in South Carolina with a "team" to discuss Branson switching his banking relationship to Fifth Third. Branson's accounts at the time included an investment account, an IRA, an account for his foundation, some loans against real property, and a line of credit secured by his investments, which included stocks and bonds.

{¶82} Convinced that Branson was a "good fit" for the bank, despite the fact that Branson's loan to value ratio ("LTV") on his asset-secured line of credit ("ASLOC") was higher than Fifth Third's normal policy limits, Fifth Third provided Branson with an exception from its normal lending restrictions during a four month "grace period" so that Branson could move his banking relationship to Fifth Third. At the meeting, Fifth Third represented that, as part of its position as Branson's investment advisor, it was going to assist Branson during the grace period with improving his LTV and coming into compliance with Fifth Third's normal lending policies. Unfortunately, this plan never came to fruition. Instead, Fifth Third—while serving in dual roles as Branson's investment advisor under a written investment-management agreement and lender under the loan agreements pertaining to the ASLOC—sold the assets less than two months into the grace period after the COVID-19 pandemic hit and the value of the assets plummeted. Thereafter, the cash was maintained in Branson's investment account, but Branson was prevented from returning the assets to the market as Fifth Third was in control of the assets and claimed to be bound by protecting the assets as collateral, despite its fiduciary duty to Branson as his investment advisor.

{¶83} Upset by Fifth Third's near immediate failure to follow the plan that induced him into doing business with Fifth Third, Branson brought suit, alleging—

22

among other things—that Fifth Third breached its fiduciary duty arising under the investment-management agreement, causing him to suffer a $3 million loss. Fifth Third moved for summary judgment on this claim, asserting that it did not breach its—admitted—fiduciary duty where it acted under the authority granted to it in the loan documents and the proceeds from the sale were placed in Branson's investment account. The trial court agreed with Fifth Third, and Branson now appears before this court for relief.

**{¶84}** Up to this point, the court proceedings have disposed of Branson's breach-of-fiduciary-duty claim by—in essence—determining that Fifth Third was allowed to ignore its fiduciary duty to Branson when Branson was in default under the loan agreements. No legal authority has been cited in support. However, my review of the record reveals that the investment-management agreement was a written agreement—separate and apart from the loan documents—that does not in any way recognize, or provide any exception on the basis of, Fifth Third's dual roles in its banking relationship with Branson. The loan documents also do not in any way set forth any written agreement as to how Fifth Third's role as lender would trump its fiduciary role to Branson as his investment advisor in such a situation. In other words, I do not see resolution of this claim as governed by the specific terms of any particular contract that was entered into at arm's length. Rather, the record reveals that multiple contracts were signed by the parties that ultimately placed Fifth Third in dual positions of acting as Branson's investment advisor for his investment account and lender on the ASLOC, without any of the written agreements directly addressing Fifth Third's conflicting positions and how that conflict may ultimately affect Fifth Third's fiduciary role.

**{¶85}** Beyond that, the record reveals that Fifth Third viewed its relationship

with Branson as "holistic" and the team repeatedly reassured Branson that it was there to help him. Yet, instead, it sold Branson's assets in the investment account shortly into the relationship to protect its loan position, even though Branson had additional real estate that could serve as added collateral to avoid the sale of the assets in his investment account. Ultimately, I would hold that the record—as a whole, including briefs filed herein and documents filed below—lacks any authority to indicate that Fifth Third was entitled to judgment as a matter of law on this claim. Therefore, with a lack of any authority in the record to suggest otherwise, I must dissent from the majority's resolution of the third assignment of error.

{¶86} In doing so, I note that I am ultimately not taking a position one way or the other on the merits of this claim. Instead, as an appellate court judge, I decline to advance a position—even on a de novo review—in favor of summary judgment on such a novel issue wherein the party moving for summary judgment—Fifth Third—missed the mark and failed to set forth any appropriate legal authority indicating that summary judgment in its favor was proper at this stage in the proceedings. In my view, this claim should be remanded for further proceedings as Fifth Third failed to prove that the claim had no basis and Branson was not entitled to a trial on the breach-of-fiduciary-duty claim. *See generally Pettiford v. Aggarwal*, 2010-Ohio-3237, ¶ 21, quoting *Byrd v. Smith*, 2006-Ohio-3455, ¶ 11, quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (""'Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.'""); *Dailey v. First Bank*, 2005-Ohio-3152, ¶ 11 (10th Dist.) ("Summary judgment is a procedural

device to terminate litigation, so it must be awarded cautiously with any doubts resolved in favor of the nonmoving party.").

## I. Background

### A. The Plan

**{¶87}** In December 2019, a team from Fifth Third flew to Branson's home in South Carolina to discuss moving his banking relationship to Fifth Third. The team consisted of a wealth-management advisor (with whom Branson had a preexisting relationship), a private banker, a senior portfolio manager, and a senior trust advisor. Relevant to our purposes here, discussions occurred surrounding moving Branson's preexisting investment-management account ("the investment account") and an ASLOC over to Fifth Third from German American Bank ("GAB").

**{¶88}** Prior to this meeting, Fifth Third had already had internal conversations and decided that Branson would be a "good fit," given that he was willing to allow Fifth Third discretion when operating as a fiduciary. Nevertheless, discussions needed to occur surrounding Branson's current LTV on the ASLOC as the LTV was higher than Fifth Third's policy allowed for. So, Fifth Third arrived with a plan in place wherein it was to raise cash in the investment account to pay down the line of credit. Given that Fifth Third was also going to be acting as Branson's investment advisor, the meeting was to include discussions surrounding Branson's investment goals and how those goals would play into the LTV.

**{¶89}** Ultimately, Fifth Third agreed to make an exception and advance close to 80 percent—rather than its standard 70 percent—on the condition that a de-leveraging plan be put into place wherein Fifth Third would give Branson a "grace period" of four months so that the team could work with him to reduce his LTV to within its standard policy limits. The period of four months was based on how long it

would take to receive the assets and work the plan. According to Fifth Third, the plan after the meeting was to reduce the LTV by extending a line of credit on Branson's home to pay down the account or, if that did not work, to raise about $1 million in the investment account. At the end of the grace period, the loan would be reassessed, and discussions would occur surrounding how to move forward.

**{¶90}** According to the private banker, this plan was never reduced to writing as it was viewed as more of a client-focused conversation about options to "explore," and not as "black and white." According to the senior portfolio manager, the plan was never reduced to writing because Fifth Third "had discretion."

**{¶91}** Branson remembered discussing a home-equity line of credit ("HELOC") with the team but denied having any recollection of a plan to raise $1 million in his investment account.

### B. The Resulting Written Agreements

#### 1. The Investment-Management Agreement

**{¶92}** On the day of the meeting, Fifth Third and Branson entered into an "Investment Management Agreement" ("IMA"), appointing Fifth Third to act as Branson's "Investment Advisor" with respect to the assets in his investment account. In this role, Fifth Third was to assist Branson with determining his investment goals, assessing his risk tolerance, and developing asset-allocation strategies. Further, Fifth Third had "full discretionary authority" to—among other things—invest and reinvest the assets. Notably, the agreement contained a portfolio-manager acknowledgement that the assets in the investment-management account would be "administered in accordance with this agreement and the procedures of the bank."

#### 2. The Loan Documents

**{¶93}** The following month, Fifth Third and Branson executed several loan

documents to effectuate the new ASLOC.

### a. The Note

**{¶94}** First, the parties executed a "Consumer Note" (the "Note"), in which Branson promised to pay Fifth Third $5,450,000, plus interest, on or before May 29, 2020 (the end of the grace period). To secure repayment of the Note and other obligations, Branson granted Fifth Third a security interest in, among other things, (1) any and all property in which Fifth Third is at any time granted a lien for any obligation "including, without limitation, all collateral specified in any of the documents executed in connection with this Note," and (2) all property in possession of Fifth Third, including securities delivered to Fifth Third "for safekeeping, or for any collection or exchange for other property." "Lien" was defined to include any security interest or pledge.

**{¶95}** The Note provided that, upon the occurrence of an event of default, Fifth Third "may, *at its option*, without any demand or notice whatsoever, cease making advances and declare this Note and all Obligations to be fully due and payable in their aggregate amount, together with accrued interest and all fees and charges applicable thereto." (Emphasis added.) Among other things, an event of default included "[t]he reasonable determination by [Fifth Third] at any time that it is inadequately secured hereby with respect to any of Borrower's obligations to Lender."

**{¶96}** As a "remed[y]" upon the occurrence of an event of default, the Note gave Fifth Third "full power to . . . sell . . . all of [the] collateral or any part thereof . . . through a private or public sale without either demand or notice to Borrower, or any advertisement, the same being hereby expressly waived . . . ." Once sold, Fifth Third could "apply, as it shall deem proper, the residue of the proceeds of such sale toward the payment of any one or more or all of the Obligations of Borrower, whether due or

not due, to Lender . . . ."  Fifth Third's "rights and remedies" were "cumulative" and could "be exercised together, separately, or in any order."

### b. The Pledge Agreement

**{¶97}** Next, the parties executed a "Pledge Agreement," in which Branson "granted a continuing security interest in, and pledge[d], mortgage[d], assign[ed], transfer[ed], deliver[ed], deposit[ed], set[] over and confirm[ed] as a first priority security interest and lien" to Fifth Third all of his "right, title, and interest in and to," among other things, (1) "each of the Pledge Accounts," and (2) "all of the Account Collateral."

**{¶98}** "Pledged Accounts" is defined as "each of, and collectively (a) the Initial Account, (b) any and all Sub-Accounts, and (c) all additions, replacements, and/or substitutions of and to any of the foregoing from time to time."  The "Initial Account" is "that certain account" governed by the IMA, and a "Sub-Account" is—among other things—an account opened, established, or maintained by Branson or Fifth Third in connection with "the services provided pursuant to the [IMA], including (without limitation) accounts established for the purpose of holding or managing assets that are tied to the [IMA]."

**{¶99}** "Account Collateral" is defined to include "all right, title and interest of" Branson "in and to" all "investment property and other property and interests in property, in each case either held in each Pledged Account or credited or related thereto, carried therein, or arising therefrom."

### c. The Collateral-Margin Addendum

**{¶100}** Next, the parties executed a "Collateral Margin Addendum" (the "Addendum").  The Addendum provided that Fifth Third requires the "Collateral Value" of the collateral "at all times to be equal to or exceed the principal balance

28

outstanding under the Note." The "Collateral Value" was defined as the "the product of the Market Value . . . of the Marketable Collateral multiplied by the Collateral Value Percentage set forth in Schedule 1 for the type of Marketable Collateral securing the Note." The failure to maintain "Marketable Collateral with sufficient Collateral Value" as required was an additional event of default under the Note. If the "Collateral Value" of the collateral was less than the outstanding principal value on the Note, Branson was permitted to pledge additional "Marketable Collateral," and/or (2) reduce the principal balance on the Note.

### d. The Account-Control Agreement

{¶101} Last, Fifth Third and Branson entered into an "Account Control Agreement," in which Fifth Third set forth the extent of its control over these accounts in order to perfect its security interest. Notably, Fifth Third appears to be acting as both lender and intermediary bank under the agreement.

## C. The Sale

{¶102} Ultimately, two liens were discovered by Fifth Third while executing the plan to secure a line of credit on Branson's home. One lien was not active and needed to be released. However, the other lien remained active.

{¶103} Further, when the assets finally arrived at Firth Third, the market had started to decline due to the COVID-19 pandemic, and the LTV was already above 80 percent. According to Fifth Third, it spoke with Branson on March 5 and let him know the team needed to move forward with raising $1 million in the investment account. However, Branson told them to "hold off" as he felt the team was "changing things up" on him.

{¶104} Shortly after, the LTV advanced to over 100 percent. So, on March 18, 2020, Fifth Third liquidated all the assets in the investment account and went to cash.

Fifth Third claims that Branson agreed with this plan. However, Branson indicated that he said he would "do whatever they said I had to do." He claims to have offered additional real estate as collateral to avoid the sale.

{¶105} Ultimately, the record indicates that after the sale Branson used a part of the later-approved HELOC as well as cash raised in his IRA to pay down the ASLOC and bring it into compliance. He was able to renew the ASLOC at the end of the grace period but was never able to reenter the market during his time with Fifth Third as he was unable to further reduce the LTV to meet Fifth Third's requirements.

{¶106} The senior portfolio manager testified that Branson knew the liquidated amount "had to be used for the line." Further, she admitted that the sale was not consistent with Branson's investment goals; rather, it was "consistent with the fact that it was pledged." She never discussed reentering the market with Branson as she had to "honor the pledge." In fact, she even changed Branson's investment policy statement after the sale to reflect a cash objective with a conservative risk posture, given that "the way that the portfolio was being managed at that time was not in line with the original investment policy statement." The banking relationship ultimately ended in 2021.

## II. Branson Brings Suit Against Fifth Third

{¶107} Branson filed suit against Fifth Third, bringing claims for breach of contract, breach of good faith and fair dealing, and "breach of fiduciary duty and conflict of interest." Relevant here, the breach-of-fiduciary-duty claim alleged that Branson placed a special confidence and trust in Fifth Third as his investment advisor under the IMA, and Fifth Third breached its fiduciary duty—while in a position of superiority and influence over him—by wrongfully selling the collateral to protect and serve its own interest in direct conflict with his stated interests.

## A. Fifth Third Moves for Summary Judgment on Branson's Claims

{¶108} Fifth Third moved for summary judgment on the claims against it. Relevant here, it moved for summary judgment on the breach-of-fiduciary-duty claim on the basis that (1) Branson could not establish the existence of a self-interested transaction, (2) Fifth Third acted within its rights under the loan documents to sell the collateral, (3) Branson agreed to the liquidation of his investment account, and (4) Branson's claim is barred by the economic-loss doctrine.

{¶109} Branson responded in opposition to summary judgment. Relevant here, he responded in opposition to summary judgment on the breach-of-fiduciary-duty claim arguing that (1) a self-interested transaction is not a requirement to prove breach of a fiduciary duty but, even if it is, Fifth Third's liquidation of the assets was motivated by its own self-interest and was against Branson's stated interest and investment goals, (2) Fifth Third cannot escape its fiduciary duties by relying upon the loan documents and "wholly ignor[ing]" the IMA—which was executed first—and the grace period, (3) Branson denied ever agreeing to the liquidation, and (4) the economic-loss doctrine does not bar his claim.

## B. The Trial Court Grants Summary Judgment in favor of Fifth Third

{¶110} The magistrate granted summary judgment on the breach-of-fiduciary-duty claim, finding that, although the IMA established a fiduciary relationship, Fifth Third did not breach that relationship as it did not engage in any self-dealing transaction, Branson benefited from the liquidation where the cash was placed in his investment account, and the liquidation was in compliance with the loan documents.

{¶111} Branson filed objections to the magistrate's decision. Relevant here, Branson argued that the magistrate erred in granting summary judgment on the breach-of-fiduciary-duty claim where Fifth Third's actions were motivated by its own

self-interest in protecting its loan position while ignoring Branson's pleas to pledge additional collateral.

**{¶112}** The trial court overruled Branson's objection, finding that there was no self-interested transaction as the funds were not used to pay off Branson's loans. Rather, "the funds instead remained liquid" in the investment account. Additionally, the trial court found that Fifth Third acted within its rights under the loan documents, "which cannot constitute a breach of fiduciary duty as a matter of law."

### III. *Branson Now Appeals*

#### A. **Standard of Review**

**{¶113}** "'To obtain summary judgment, the moving party must show that (1) there are no genuine issues of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion when reviewing the evidence in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party.'" *Tauchert v. Rumpke Sanitary Landfill, Inc.*, 2024-Ohio-4551, ¶ 8 (1st Dist.), quoting *Midland Credit Mgmt. Inc. v. Naber*, 2024-Ohio-1028, ¶ 6 (1st Dist.). "'The nonmoving party has the initial burden of informing the trial court of the basis for the party's motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential elements of the nonmoving party's claim.'" *Id.*, quoting *Midland* at ¶ 6. "'If the moving party meets this initial burden, the nonmoving party then bears the burden of setting forth "specific facts showing that there is a genuine issue for trial."'" *Id.*, quoting *Midland* at ¶ 6, quoting Civ.R. 56(E). "'If the nonmoving party does not do so, then summary judgment is appropriate and must be entered against the nonmoving party.'" *Id.*, quoting *Midland* at ¶ 6.

**{¶114}** "Summary judgment is a procedural device to terminate litigation and

to avoid a formal trial where there is nothing to try." *Norris v. Ohio Std. Oil Co.*, 70 Ohio St.2d 1, 2 (1982). "It must be awarded with caution, resolving doubts and construing evidence against the moving party, and granted only when it appears from the evidentiary material that reasonable minds can reach only an adverse conclusion as to the party opposing the motion." (Citations omitted.) *Id*. "A successful motion for summary judgment rests on a two-part foundation that there is no genuine issue as to any material fact and the nonmoving party is entitled to judgment as a matter of law." (Citations omitted.) *Id*.

{¶115} "'This court reviews a trial court's grant of summary judgment de novo.'" *Tauchert* at ¶ 9, citing *Mid-Century Ins. Co. v. Stites*, 2021-Ohio-3839, ¶ 10 (1st Dist.).

## B. Branson's Third Assignment of Error

{¶116} In his third assignment of error, Branson challenges the trial court's grant of summary judgment on his breach-of-fiduciary-duty claim and argues that the trial court improperly found that Fifth Third did not engage in a self-interested transaction where Fifth Third liquidated the assets to protect its loan position and against his stated interest and investment goals. I agree.

## C. Law and Analysis

{¶117} "The elements for a breach of fiduciary duty claim are '(1) the existence of a duty arising from a fiduciary relationship, (2) the failure to observe that duty, and (3) an injury proximately resulting.'" *White v. Pitman*, 2020-Ohio-3957, ¶ 31 (1st Dist.), quoting *Vontz v. Miller*, 2016-Ohio-8477, ¶ 28 (1st Dist.).

### 1. The Fiduciary Relationship

{¶118} "The term 'fiduciary relationship' has been defined as a relationship 'in which special confidence and trust is reposed in the integrity and fidelity of another

33

and there is a resulting position of superiority or influence, acquired by virtue of this special trust.'" *Groob v. KeyBank*, 2006-Ohio-1189, ¶ 16, quoting *In re Termination of Emp. of Pratt*, 40 Ohio St.2d 107, 115 (1974). "Similarly, 'fiduciary' has been defined as a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking." (Cleaned up.) *Id.*, quoting *Strock v. Pressnell*, 38 Ohio St.3d 207, 216 (1988).

{¶119} "[A] debtor-and-creditor relationship does not generally create a fiduciary relationship." *Id.* at ¶ 17, citing *Umbaugh Pole Bldg. Co., Inc. v. Scott*, 58 Ohio St.2d 282 (1979), paragraph one of the syllabus. "When both parties understand that a special trust or confidence has been reposed, however, a fiduciary relationship may be established." *Id.*, citing *Umbaugh* at paragraph one of the syllabus.

{¶120} More specifically, "a fiduciary duty does not arise between a bank and a prospective borrower unless there are special circumstances." *Id.* at ¶ 22, citing *Umbaugh*, *Stone v. Davis*, 66 Ohio St.2d 74 (1981), and *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98 (1988). In Ohio, this principle has been codified by the General Assembly in R.C. 1109.151. *See id.* at ¶ 22, citing former R.C. 1109.15(D). This section states,

> Unless otherwise expressly agreed to in writing by the bank, the relationship between a bank and its obligor, or a bank and its customer, creates no fiduciary or other relationship between the parties or any special duty on the part of the bank to the customer or any other party.

{¶121} "In determining whether a fiduciary relationship has been created, the main question is whether a party agreed to act primarily for the benefit of another in matters connected with its undertaking." *Hope Academy Broadway Campus v. White Hat Mgmt., L.L.C.*, 2015-Ohio-3716, ¶ 43, citing *Strock*, 38 Ohio St.3d at 216.

**{¶122}** Here, no party disputes that a fiduciary relationship existed between Fifth Third and Branson pursuant to the IMA. *See generally Mathia v. Rosser*, 2002-Ohio-2772, ¶ 18 (10th Dist.) ("[T]here is general agreement that a broker or financial advisor is in a fiduciary relationship with [its] clients."). Thus, this element was not at issue in the motion for summary judgment.

## 2. Whether Fifth Third Breached Its Fiduciary Duty

**{¶123}** Instead, when moving for summary judgment, Fifth Third argued that Branson could not establish the existence of a self-interested transaction where the securities were sold on the open market for market value and credited to Branson's account. The trial court agreed with Fifth Third. I disagree.

**{¶124}** While the record does support that the cash was maintained in the investment account, the record also discloses that the assets were sold to prevent the LTV from dropping any lower, even though Branson offered additional collateral to secure the loan, and Branson was thereafter prevented from taking any action upon the cash in his investment account, including returning the assets to market, because such action was viewed as contrary to the pledge.

**{¶125}** Notably, this is not a situation wherein the written contracts themselves incorporate the dual roles played by the bank and expressly acknowledge the conflict and risk involved or set forth how the dual roles may ultimately affect the investment account. *Compare Guerrand-Hermes v. J.P. Morgan & Co.*, 2 A.D.3d 235, 769 N.Y.S.2d 240 (N.Y.App.Div. 2003).

**{¶126}** Here, nothing in the IMA or the loan documents acknowledge the conflicting roles—outside of the pledge of the assets itself—and there is certainly nothing that provides Fifth Third with the express authority to liquidate the assets simply to protect its loan position in a declining market, even where such action is

openly in conflict with Branson's stated investment goals and even where Fifth Third took possession of the assets pursuant to an agreed-upon plan to provide Branson with a grace period to meet the required LVT. The investment advisor herself even admitted she was prevented from taking any action to meet Branson's investment goals as she had to "honor the pledge," and admitted that the way the portfolio was being managed after the sale "was not in line with the original investment policy statement." Therefore, she had to change the investment policy statement—using Fifth Third's discretion—to reflect a cash objective with a conservative risk posture. This was not in line with Branson's originally stated investment goals.

{¶127} Notably, when moving for summary judgment, Fifth Third argued that to allow a claim for breach of fiduciary duty to proceed on the basis that it acted in its own self-interest by selling the collateral when Branson was in default would "undermine the well-established American banking law." It asserted,

> Under Branson's conception of "fiduciary duty," a financial institution could never sell collateral when the value of that collateral was no longer sufficient (or as a result of any other contractual default), because such a sale would be against the borrower's best interest. But of course, this cannot be—and is not—the law. Branson executed the note, Collateral Margin Addendum, and the Pledge Agreement as a borrower, and as a lender, Fifth Third was (and is) entitled to enforce its contractual rights.

{¶128} However, the only principle established by this argument is that Fifth Third is not liable to Branson *as a lender*. This argument fails to acknowledge that it was acting in dual roles as lender *and* investment advisor, which it admits was a fiduciary position. Fifth Third failed to set forth any authority to support the

proposition that its status as lender trumps and overrides any claim of liability based on its role as an investment advisor, in the absence of any written agreement saying as much.

**{¶129}** The only authority cited by Fifth Third for this proposition when moving for summary judgment was *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 4 (2019), and *W.A.K. ex rel. Karo v. Wachovia Bank, N.A.*, 712 F.Supp.2d 476 (E.D.Va. 2010). However, both of these cases were decided based on the express terms of the written documents governing the fiduciary relationships, which plainly authorized the actions at issue. *See Hussein* at ¶ 47; *Karo* at 486-487. As set forth above, that is not the case here.

**{¶130}** Because resolution of this claim is not governed by the express terms of any written agreement in this case and because the record lacks any authority to show that a reasonable trier of fact could not find that Fifth Third breached its fiduciary duty to Branson by liquidating the assets, I would hold that Fifth Third failed to meet its burden on summary judgment to show—as a matter of law—that it failed to engage in a self-interested transaction for purposes of this claim.[2]

### 3. Injury

**{¶131}** Fifth Third did not dispute this element in its motion for summary judgment. Nevertheless, in responding in opposition to summary judgment, Branson submitted an affidavit from a certified public accountant that computed the "financial damage" incurred by Branson as a result of the liquidation and estimated the gross loss to be $3,422,500. These damages were said to represent "foregone income that

---

[2] I decline to address the remaining arguments advanced by Fifth Third upon moving for summary judgment as the additional arguments were not addressed by the trial court and are not now raised before this court on appeal as an alternative basis to affirm the trial court's decision.

would have been generated by the assets, appreciation of the assets, as well as taxes incurred by Branson because of the sale."

### IV. *Fifth Third Failed to Meet Its Burden on Summary Judgment*

{¶132} Based on the foregoing, I would hold that Fifth Third failed to meet its burden on summary judgment to show that it was entitled to judgment as a matter of law on Branson's breach-of-fiduciary-duty claim. Summary judgment is a procedural vehicle that should be utilized cautiously. I decline to hold that summary judgment was appropriate in a case wherein Fifth Third failed to cite relevant legal authority and relies on written contracts that *do not* address its dual and conflicting roles when asserting that it was entitled to judgment as a matter of law in its favor on the breach-of-fiduciary-duty claim. Consequently, I would sustain the third assignment of error, reverse the trial court's judgment and remand the cause for further proceedings on this claim.